IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 18-00224-01-CR-W-DGK |
| ) | |
| RAFEE C. PRICE, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Rafee C. Price's Motion to Suppress Evidence and Statements (Doc. #20). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On August 28, 2018, the grand jury returned a one-count Indictment against defendant Rafee C. Price. The Indictment charges that on or about June 30, 2018, defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, to wit: a Glock Model 23, .40 caliber pistol.

On May 1, 2019, an evidentiary hearing was held on defendant's motion to suppress. Defendant Price was represented by Assistant Federal Public Defender Anita L. Burns. The Government was represented by Assistant United States Attorney Adam Caine. The Government called Detective James Manley, Detective Robert Evans, Officer David Barbour, and Officer Patrick Lewis of the Kansas City, Missouri Police Department, and FBI Special Agent Doug McKelway as witnesses. The defense called Detective Brian Tomanio of the

Kansas City, Missouri Police Department to testify.

## II. FACTS

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On June 30, 2018, Detective James Manley was involved in surveillance at the funeral of an individual by the name of Justin Powell. (Tr. at 4-5.) The church was opening its doors for the funeral at 9:00 a.m. (Tr. at 10.) Detective Manley testified that law enforcement officers were present specifically for threats of violence. (Tr. at 4.) Mr. Powell had been murdered and there was concern that there might be retaliatory violence. (Tr. at 27, 67.) There was also the possibility of apprehending fugitives, who were associates of the deceased and attending the service. (Tr. at 4.)

2. At 8:30 a.m., fourteen law enforcement officers[1] attended a briefing where a packet (Government's Exhibit 1) was handed out. (Tr. at 10, 42.) Detective Evans passed out the briefing packet. (Tr. at 27, 46.) Detective Manley sent, via text, photographs of several people from the briefing packet to a confidential source he knew would be attending the funeral. (Tr. at 6-7, 12.) According to Detective Manley, the confidential source, who Manley had used for ten years, had always provided reliable information. (Tr. at 5-6, 16.) One of the photographs that Detective Manley sent the source was a photograph of an individual by the name of Mark Looney. (Tr. at 7.) In the photograph, Looney had long dreadlocks. (Tr. at 46.) Detective Evans did not investigate whether or not the photograph of Looney was recent. (Tr. at 46.) There was an outstanding federal arrest warrant for Looney. (Tr. at 5.) Detective Evans testified that he had information that Looney was known to be armed. (Tr. at 48.) Detective Manley testified that Looney was an associate of Justin Powell, so it was plausible that Looney might attend the funeral to show his respect. (Tr. at 5.) Detective Manley did not provide his source with the names of the people in the photographs. (Tr. at 7.) After Detective Manley sent the photograph of Mark Looney, the source responded via text, "Oh, that's Looney." (Tr. at 8, 13.)

3. The confidential source called Detective Manley at the conclusion of the funeral and said that Looney was getting into the driver's seat of a silver Cadillac. (Tr. at 8.) Approximately ten minutes later, the source called and said the car was moving and leaving. (Tr. at 19.) The confidential source provided the license

---

[1]Detective Robert Evans listed the officers present: Captain Legg, Sergeant Hamilton, Detective Evans, Detective Corey Horalek, Detective Davis, Detective Paquette, Detective Armstead, Detective Smail, Detective Manley, Officer Barbour, Officer Massey, Officer Lewis, Officer Delaney, and Special Agent McKelway. (Tr. at 42.)

plate number of the Cadillac. (Tr. at 8.) Detective Manley relayed this information over the radio to surveillance crews. (Tr. at 8.) Detective Manley did not personally observe the Cadillac. (Tr. at 8.) Detective Manley testified that there was a large crowd (upwards of a hundred) at the funeral and that cars were spanning blocks and blocks on a roadway with no shoulders, so the area was congested. (Tr. at 9, 23.)

4. The decision was made to allow Mark Looney to leave the area before officers tried to effect an arrest. (Tr. at 29.) Detective Evans testified that this decision was made out of respect for the family of Justin Powell. (Tr. at 29.) As the Cadillac was leaving, information was passed from one surveillance crew to the next. (Tr. at 29.) The officers also obtained assistance from a Kansas City police helicopter. (Tr. at 29.) The helicopter officer was able to put the Cadillac under surveillance and follow it out of the immediate area of the church. (Tr. at 29.) The helicopter officer reported that the Cadillac pulled into 8305 Wornall. (Tr. at 30.) Detective Evans drove by on Wornall and confirmed that this was the vehicle with the reported license plate which had left the church. (Tr. at 31.) Detective Evans was not able to see the occupants of the vehicle because of the heavy tint on the windows. (Tr. at 31.)

5. Special Agent Doug McKelway stopped his vehicle less than a block to the south of 8305 Wornall. (Tr. at 71.) Special Agent McKelway observed the driver get out of the Cadillac. (Tr. at 32.) Special Agent McKelway communicated to Detective Evans that he believed the driver was probably Mark Looney. (Tr. at 32, 72.) Special Agent McKelway testified that the driver was close in appearance (similar build, similar skin tone, and similar age) to the picture he had seen of Looney in the briefing packet. (Tr. at 72.) Special Agent McKelway testified that the driver had shorter dreadlock hair than the picture of Looney, but stated that "people can get haircuts." (Tr. at 72.) Detective Evans made the decision to direct tactical officers to move into the parking lot and make the arrest. (Tr. at 32.) Detective Evans testified that he made this decision based on the confidential source telling Detective Manley that Mark Looney was driving the vehicle and Special Agent McKelway's belief, upon looking at the driver when he exited the vehicle, that the driver was Looney. (Tr. at 32.)

6. Officer David Barbour is part of a tactical unit that handles fugitive apprehension and narcotics warrants. (Tr. at 80.) On June 30, 2018, Officer Barbour was assisting the Drug Enforcement Unit in looking for a fugitive by the name of Mark Looney. (Tr. at 81.) Officer Barbour was present at the morning briefing and was advised that Looney had been armed in the past. (Tr. at 81.) After the Cadillac stopped at 8305 Wornall, Officer Barbour was directed to conduct a car stop. (Tr. at 83.) As Officer Barbour pulled up to the Cadillac, the driver and the rear passenger had already gotten back in the vehicle. (Tr. at 84.) Officer Barbour was not able to see the driver before he was back inside the vehicle. (Tr.

3

at 84.) Officer Barbour testified that the front passenger was standing outside of the vehicle with the door closed. (Tr. at 84.) Officer Barbour explained that in a felony car stop, officers do not walk up to the vehicle due to the fact that the individuals possibly are armed. (Tr. at 99.) The officers started giving verbal commands for the subjects to put their hands up. (Tr. at 116.) Officer Barbour was giving the front passenger verbal commands to put his hands up and to get on the ground. (Tr. at 84-85.) Officer Barbour testified that the front passenger made eye contact with Barbour, but did not obey the commands. (Tr. at 85.) The front passenger slowly turned around, opened the door, and got back in the vehicle. (Tr. at 85, 116.) Officer Barbour testified that the front passenger's actions raised Barbour's senses and caused him to think there was something wrong here. (Tr. at 85.) The officers continued to give verbal commands. (Tr. at 85.)

7.  Approximately thirty seconds later, the driver of the vehicle and the rear passenger exited the vehicle and got down on the ground. (Tr. at 85-86.) Officer Barbour testified that he watched the front passenger's actions while the driver and rear passenger were exiting the vehicle. (Tr. at 86.) The front passenger kept looking around and bending over towards the front of the seat. (Tr. at 86.) Officer Barbour testified that based on his training and experience, he believed that the front passenger was either trying to stuff something or retrieve something. (Tr. at 86.) The front passenger exited the vehicle several seconds later and lay on the ground. (Tr. at 86.) Officer Barbour testified that the officers then "went up, placed them all in handcuffs and picked them up, started getting information, made sure there wasn't anybody else in the car and went from there." (Tr. at 86.)

8.  Special Agent McKelway testified that he was able to watch the marked units move in and make the arrest. (Tr. at 73.) Special Agent McKelway testified that the driver and the backseat passenger immediately complied with the officers' commands. (Tr. at 73.) Special Agent McKelway testified that the front seat passenger got back in the vehicle and was there for a few seconds before he came back out. (Tr. at 73.) After the subjects were taken into custody, Special Agent McKelway left the area. (Tr. at 73.)

9.  When Officer Barbour approached the vehicle to take the front passenger into custody, Barbour observed a firearm between the center console and the front passenger seat through the open door of the vehicle. (Tr. at 87.) The tactical officers called Detective Evans to advise that they had observed a gun in the vehicle. (Tr. at 33.) Detective Evans responded to the scene to assist in the investigation. (Tr. at 33.) As Detective Evans was walking up, one of the tactical officers said to Evans that he could look in the open door of the vehicle and see a gun in plain view. (Tr. at 33; Gov. Exh. 2.) Detective Evans saw a handgun next to the passenger's seat. (Tr. at 57.) Detective Evans then went over to visit with the tactical officers who were getting the subjects' information[2] and conducting

---

[2] The front passenger was identified as Rafee Price. (Tr. at 87.)

4

record checks. (Tr. at 34, 88.) Looking at the parties, Detective Evans saw the person who had been driving the vehicle and believed him to be Mark Looney. (Tr. at 34.) Detective Evans testified that "descriptors were fairly similar, height, and they just kind of had the same appearance." (Tr. at 34.)

10. Officer Barbour testified that he did not have an opportunity to see the driver of the vehicle until the officers "got everybody in custody." (Tr. at 88.) Officer Barbour's partner, Officer Patrick Lewis, was on the driver's side of the vehicle and Barbour's responsibility was on the passenger's side. (Tr. at 88, 115.) When Officer Barbour saw the driver, he believed the driver was Mark Looney. (Tr. at 88.) Officer Lewis testified that he believed the driver was Mark Looney. (Tr. at 117.) Officers Barbour and Lewis testified that based on the information they had been given, the driver looked very similar to Looney. (Tr. at 88, 117-18.) The difference in the hair between the driver and the briefing packet photograph did not cause Officer Lewis any concern because "hair is something that's easily changeable and oftentimes people's DOR photos or booking photos their hair is changed from the time that we effect an arrest from the time the picture was taken." (Tr. at 118.) Officer Barbour testified that it took quite a while to determine that the driver was not Looney because the driver kept misspelling his own name when the officers were getting his information. (Tr. at 89.) Officer Barbour testified that if it takes someone several tries to spell their name, the person is usually lying. (Tr. at 89.) Officer Barbour testified that he deals with individuals giving fake names all the time. (Tr. at 89-90.)

11. While getting the driver's information, Officer Barbour asked him if there was anything in the car that would hurt anybody. (Tr. at 89.) Officer Barbour testified that he asked this question because "we had two other carloads of people showing up at the time that I believe were his family members from the funeral, and we had to make sure that the scene was secure." (Tr. at 103.) The driver replied that there was a firearm under his seat. (Tr. at 89.) At that point, Officer Barbour called Detective Evans over to talk to the driver, who Barbour still believed was Mark Looney. (Tr. at 89.) Officer Barbour knew that Looney was listed as a prohibited person in the briefing packet. (Tr. at 90; Gov. Exh. 1.)

12. After the tactical officers had done some research through computer checks, it was determined that the driver of the vehicle was not Mark Looney, but instead Antwaine Adams. (Tr. at 36-37, 89; Def. Exh. 3.) Detective Evans estimated that it took roughly five minutes after he had arrived on the scene for officers to determine that the driver was not Mark Looney. (Tr. at 37.)

13. Mr. Adams told Detective Evans that the vehicle belonged to him. (Tr. at 37.) Detective Evans asked Mr. Adams if he would be willing to give Evans consent to search the vehicle. (Tr. at 37.) Mr. Adams gave Detective Evans verbal consent. (Tr. at 37.) The tactical officers then searched the vehicle. (Tr. at 37.) Two

5

firearms were recovered from the vehicle, one from between the passenger's seat and the console and one from underneath the driver's seat. (Tr. at 37-38, 90-92.) No one objected as the vehicle was being searched. (Tr. at 38, 91.)

14. Detective Evans and Detective Tomanio interviewed defendant Price later that afternoon. (Tr. at 38-39.) Price was advised of his rights prior to the interview. (Tr. at 39.) Detective Evans testified that Price was cooperative during the interview. (Tr. at 39.)

15. Detective Tomanio also interviewed Mr. Adams. (Tr. at 133.) Mr. Adams told Detective Tomanio that the Cadillac belonged to him. (Tr. at 133.)

## III. DISCUSSION

Defendant Price seeks to suppress "all statements and evidence seized as a result of his unlawful detention." (Price Mot. to Suppress Evidence and Statements; Doc. #20 at 1.) Specifically, defendant argues his detention exceeded its permissible scope, both temporally and with respect to its subject matter. (*Id.* at 4.) "The only purpose of the detention was to determine if the driver was Mark Looney, and that purpose ended as soon as the officers knew, or reasonably should have known, that Antwaine Adams was not the man they intended to arrest." (*Id.*) According to defendant Price, the detention was improperly extended so that the officers could pursue other objectives, such as checking defendant Price's identification, running a computer check on Price for warrants and past criminal history, and searching the vehicle. (*Id.*)

The vehicle in which defendant Price was a passenger was stopped as a result of law enforcement attempting to execute a federal arrest warrant for Mark Looney. As set forth in *United States v. Shields*, 519 F.3d 836, 837 (8th Cir. 2008), when officers have reason to believe that a person for whom they have a valid arrest warrant is within a vehicle, the officers are justified in conducting a car stop. Evidence was presented at the hearing to show that a confidential source (who was at the funeral which officers were surveilling, who had proved reliable in the past, and who responded with "Oh, that's Looney" when presented with a

6

photograph that did not include a name) advised that Looney was in attendance at the funeral. (Fact Nos. 2 and 3.) The confidential source then advised Detective Manley that Looney had gotten into the driver's seat of a silver Cadillac. (Fact No. 3.) The confidential source provided the license plate number of the Cadillac. (*Id.*) The Cadillac was under surveillance by a police helicopter as it left the location of the funeral. (Fact No. 4.) When the vehicle stopped in a parking lot at 8305 Wornall, Detective Evans drove by and confirmed that this was the vehicle with the reported license plate which had left the church. (*Id.*) When the driver exited the vehicle, Special Agent McKelway, who was parked less than a block to the south of 8305 Wornall, was able to see the driver and believed him to be Mark Looney based on the photograph of Looney in the briefing packet. (Fact No. 5.) Based on this evidence, the Court finds (and defendant Price does not appear to challenge) that the officers were justified in conducting the car stop.

Defendant Price argues that he was detained beyond the permissible scope of the stop, which was to determine whether the driver of the vehicle was Mark Looney. However, as noted in the caselaw provided by defendant, further detention after the point at which the purpose of the stop is resolved is not unlawful if there is evidence to support a claim of reasonable suspicion beyond that which led to the initial stop. *See Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609, 1616-17 (2015); *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001); *United States v. Mendoza-Carrillo*, 107 F.Supp.2d 1098, 1102 (D.S.D. 2000). Prior to the determination that Mark Looney was not the driver of the vehicle, defendant Price engaged in conduct which provided the officers with reasonable suspicion to believe that Price was engaged in criminal activity. *See United States v. Martinez-Cortes*, 566 F.3d 767, 771 (8th Cir. 2009)(furtive actions, i.e. where occupants of vehicle did not promptly comply with police

7

command to show their hands and driver moved his arms as if to hide something, give officers reason to suspect that criminal activity is afoot). Defendant Price argues that the *Martinez-Cortes* case has no application to his case because in *Martinez-Cortes* the officers had independent justification for detaining the occupants of the vehicle who were leaving a residence for which officers had a search warrant. (Price Reply; Doc. #29 at 6.) Defendant Price further argues that a no-knock warrant had been issued in *Martinez-Cortes* which meant that evidence had been provided to support a finding of probable cause and a finding that firearms were present in the house. (*Id.*) The fact that a judge had found probable cause to issue a search warrant for a residence which might contain firearms and from which the subjects in *Martinez-Cortes* were leaving does not appear to be of any greater significance than the fact that a federal judge had found probable cause to issue an arrest warrant for Mark Looney who was known to be armed and whom officers believed was driving the vehicle that they stopped. In addition, while the *Martinez-Cortes* court may have found that the officers had authority to detain the occupants of the vehicle based on the search warrant, the Court specifically stated, "These furtive actions gave the officers reason to suspect, indeed, probable cause to believe that criminal activity was afoot."[3] *Martinez-Cortes*, 566 F.3d at 771. Contrary to defendant's argument, the Court finds that the decision in *Martinez-Cortes* is applicable to this case.

---

[3]Defendant Price cites the case of *State v. Dechene*, 332 A.2d 125 (R.I. 1975), for the proposition that a driver's furtive movements do not provide reasonable suspicion. (Price Reply; Doc. #29 at 4.) The *Dechene* court stated: "the extension of a *Terry*-type search into the interior of an automobile … cannot be validated by mere gestures unless coupled with other evidence that the suspect is dangerous." 332 A.2d at 127-28. The case before this Court is distinguishable from *Dechene*. The officers in this case had other evidence, as set out below, which suggested a dangerous situation. In addition, the officers in this case did not conduct a *Terry*-type search of the vehicle based on defendant Price's furtive gestures.

The record in this case establishes that officers had been advised that the subject of the arrest warrant was known to be armed. (Fact No. 2.) When officers arrived to conduct the car stop to execute the arrest warrant, defendant Price was standing outside of the vehicle with the door closed. (Fact No. 6.) Officer Barbour gave Price verbal commands to put his hands up and to get on the ground.[4] (*Id.*) Defendant Price made eye contact with Officer Barbour, but did not obey the commands. (*Id.*) Instead, Price opened the door and got back in the vehicle. (*Id.*) While the driver and rear passenger were exiting the vehicle, Officer Barbour observed defendant Price looking around and bending over towards the front of the seat. (Fact No. 7.) Officer Barbour believed that Price was either trying to stuff something or retrieve something. (*Id.*) Several seconds later, Price exited the vehicle. (*Id.*) Officer Barbour observed a firearm between the center console and the front passenger seat through the open door of the vehicle. (Fact No. 9.) The Court finds that the officers had a particularized and objective basis for suspecting defendant Price of legal wrongdoing which justified his detention aside from the original scope of the stop. The officers were justified in ordering defendant Price out of the vehicle, in handcuffing him, and in running his information through the police computer. *See United States v. Martinez-Cortes*, 566 F.3d 767, 771 (8th Cir. 2009).

Further, regardless of whether defendant Price engaged in suspicious conduct, officers may obtain identification from passengers and run record checks of those passengers during an investigatory stop of a vehicle. *See United States v. White*, 81 F.3d 775, 7789 (8th Cir. 1996)

---

[4]The Court notes that "a police officer may take steps reasonably necessary to protect his or her personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling suspicion in a short period of time." *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987)(citing *United States v. Jones*, 759 F.2d 633, 636-37 (8th Cir.), *cert. denied*, 474 U.S. 837 (1985)). Given the information that Mark Looney was known to be armed (Fact No. 2), the Court finds that the officers' actions were reasonably necessary to protect the officers' personal safety while they attempted to execute the arrest warrant.

(officer may run a computer check to ascertain whether there are outstanding arrest warrants for occupants of car); *United States v. Dawdy*, 46 F.3d 1427, 1430 (8th Cir. 1995)(requests for identification of all occupants and warrant checks are within reasonable scope of detention); *United States v. Morgan*, No. 17-00086-01-CR-W-BP, 2018 WL 6445419, *2 (W.D. Mo. Dec. 10, 2018)("An officer may also run a computer check to determine whether there are outstanding warrants for any passengers in the car … which alerted them to [the passenger's] prior criminal convictions.")

In *United States v. Hicks*, No. 18-CR-6041CJS, 2018 WL 6595934 (W.D.N.Y. Dec. 14, 2018), the court discussed an officer's ability to obtain identification from passengers and run record checks of those passengers in light of the Supreme Court's decision in *Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609 (2015).[5]  The *Hicks* court stated:

> Because "[t]raffic stops are 'especially fraught with danger to police officers,'" officers are also permitted "to take certain negligibly burdensome precautions in order to complete [the] mission safely." *Rodriguez v. United States*, 135 S. Ct. at 1616 (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)) …. Those precautions include a criminal records search, a check for outstanding warrants, and a request that the driver or passengers exit the vehicle.  *See Rodriguez*, 135 S. Ct. at 1615-16 ….
>
> * * *
>
> Further, although the Supreme Court has not explicitly held that inquiry into a passenger's identity is permissible, *see United States v. Clark*, 879 F.3d 1, 4 (1st Cir. 2018)("[a]lthough the Supreme Court has not explicitly held that an inquiry into a passenger's identity is permissible, its precedent inevitably leads to that conclusion")(quoting *United States v. Fernandez*, 600 F.3d 56, 58 (1st Cir. 2010)), numerous lower courts have held that questions relating to the identity of a passenger are routine and ordinary inquiries incident to a traffic stop and, in any event, are permissible considering the inherent dangerousness of traffic stops, *see, e.g.*, *United States v. Reynolds*, 729 F. App'x 639, 643 (10th Cir. 2018)("[w]hile a

---

[5]In *Rodriguez*, the Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."  135 S. Ct. at 1612.

Case 4:18-cr-00224-DGK   Document 40   Filed 06/21/19   Page 10 of 14

traffic stop is ongoing, however, an officer has wide discretion to take reasonable precautions to protect his safety, including asking for identification from passengers and running background checks on them")(internal quotations and brackets omitted); *United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015) ("[t]he trooper checked the occupants' criminal histories on the computer in his car – a procedure permissible even without reasonable suspicion – indeed a procedure in itself normally reasonable, as it takes little time and may reveal outstanding arrest warrants")(internal citations omitted); *United States v. Pack*, 612 F.3d 341, 351 (5th Cir.)(request for passenger identification and computer check on passenger's license fell within lawful scope of traffic stop), *modified on denial of reh'g*, 622 F.3d 383 (5th Cir.), *cert. denied*, 562 U.S. 1052 (2010); *United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010)(law enforcement officer did not unnecessarily extend traffic stop by requesting identification from driver and passenger and running computer check); *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007)("[i]f an officer may 'as a matter of course' and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification") (internal citation omitted), *cert. denied*, 552 U.S. 1189 (2008); *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007)("because passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well") (internal citation omitted); *United States v. Espinosa*, 2018 WL 1972466, *4 (D. Utah 2018)("the Tenth Circuit has concluded without qualification that, as a part of a lawful traffic stop, an officer may request a passenger's identification information"); *United States v. Fortune*, 2017 WL 1367050, *6 (E.D. Tenn.)("[a]s the Fourth Amendment permits officers to check the identification of passengers, [the officer] was within the boundaries of the law to perform such checks"), *report and recommendation adopted*, 2017 WL 1347575 (E.D. Tenn. 2017); [*United States v.*] *Groce*, 2008 WL 3540196 at *4 [(W.D.N.Y. Jan. 2, 2008)]("it was appropriate for [the officer] to ask the defendant for his identification and to check that identification against [a] database based solely on his status as a passenger in the vehicle which was stopped for speeding"). *But see United States v. Henderson*, 463 F.3d 27, 46 (1st Cir. 2006)("[officer's] demand for [defendant's] identifying information and his subsequent investigation of [defendant] expanded the scope of the stop, changed the target of the stop, and prolonged the stop"); *United States v. Kersey*, 2018 WL 1456129, *3 (S.D. Ohio 2018)(reasonable suspicion is required to investigate identity of passenger after conclusion of traffic stop); *United States v. Kenyon*, 2018 WL 1665747, *6 (N.D. W. Va. 2018)("[i]t was permissible for the officer to make inquiries as to the passengers, including the defendant, and other matters, because the officer did not extend the stop to make these inquiries").

2018 WL 6595934, at *6-7. *Accord United States v. Terry*, No. 3:18-cr-24, 2019 WL 2176330, at *15 (W.D. Pa. May 20, 2019)("most courts confronted with the issue have determined that

11

checking a passenger's driver's license in addition to the vehicle driver's license is not an impermissible extension of a traffic stop").

Finally, in *United States v. Roberts*, 687 F.3d 1096, 1099 (8th Cir. 2012), defendant Roberts, a passenger in a vehicle stopped for an unlit license plate violation, moved for suppression of evidence arguing that the officer unconstitutionally extended the duration of the traffic stop when he turned his focus away from the initial purpose of the stop and toward the identity and warrant status of the vehicle's passengers. The Court denied defendant Roberts's motion to suppress stating: "Because [the officer's] investigation into Roberts's warrant status was concurrent with his conduct of the investigation into the initial purposes of traffic stop, the traffic stop was not prolonged by the inquiry into Roberts's warrant status." *Id.* at 1100.

In the case before this Court, the evidence clearly shows that the officers' actions in obtaining defendant Price's identification and running a computer check on Price which alerted officers that Price was a convicted felon did not extend the stop.[6] Rather, the task that took substantial time was the identification of the driver of the vehicle. Evidence was presented at the hearing that the officers believed they had Mark Looney in custody, despite the driver's contention that he was not Looney. Detective Evans testified that he saw the person who had been driving the vehicle and believed him to be Mark Looney because the "descriptors were fairly similar, height, and they just kind of had the same appearance." (Fact No. 9.) Officer Barbour and Officer Lewis each testified that they believed the driver was Mark Looney because the driver looked very similar to Looney. (Fact No. 10.) The difference in the hair between the driver and the briefing packet photograph did not cause the officers concerns because hair is easily changed.

---

[6]When Detective Evans arrived on the scene, the tactical officers were getting the subjects' information and conducting record checks. (Fact No. 9.)

12

Case 4:18-cr-00224-DGK   Document 40   Filed 06/21/19   Page 12 of 14

(*Id.*) Officer Barbour testified that it took quite a while to determine that the driver was not Looney because the driver kept misspelling his name which caused the officers to believe that he was lying. (*Id.*) Officer Barbour testified that he deals with individuals giving fake names all the time. (*Id.*) Detective Evans estimated that it took roughly five minutes after he had arrived on the scene for officers to determine that the driver was not Mark Looney. (Fact No. 12.)

Defendant Price argues that this Court should suppress all statements and evidence seized as a result of his unlawful detention. (Price Mot. to Suppress Evidence and Statements; Doc. #20 at 1.) However, the Court finds that defendant Price was not unlawfully detained. As set forth above, the officers' credible testimony showed that they had a particularized and objective basis for suspecting defendant Price of legal wrongdoing which justified his detention aside from the original scope of the stop. This suspicion, as well as the fact that officers may obtain identification from passengers and run record checks of those passengers during an investigatory stop of a vehicle, provided authority for the officers to run defendant Price's information through the police computer. Upon discovering that defendant Price was a convicted felon, officers were authorized to arrest Price for unlawfully possessing the firearm that officers had observed in plain view where Price had been seated in the vehicle when they initially took Price into custody.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Price's Motion to Suppress Evidence and Statements (Doc. #20).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on

13

appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                             */s/ Lajuana M. Counts*
                                             Lajuana M. Counts
                                             United States Magistrate Judge